NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____
:
AMERICAN ESTATES WINES, INC., a    :
Pennsylvania Corporation,           :
                                    :
        Plaintiff,                  :     Civil Action No. 07-2474 (JAG)
                                    :
        v.                          :     **OPINION**
                                    :
KREGLINGER WINE ESTATES PTY,        :
LTD, and JOHN DOES 1-10,            :
                                    :
        Defendants.                 :
_____:

**GREENAWAY, JR., U.S.D.J.**

This matter comes before this Court on the motion by Defendant Kreglinger Wine Estates Pty, Ltd. ("Kreglinger") to dismiss the Complaint for lack of personal jurisdiction, pursuant to FED. R. CIV. P. 12(b)(2). For the reasons set forth below, the motion to dismiss will be denied.

**I. FACTUAL BACKGROUND**

Plaintiff American Estates Wines, Inc. ("American Estates") is a Pennsylvania corporation with its principal place of business in Summit, New Jersey. American Estates is in the business of importing, marketing, and selling wines from Australia and New Zealand. (Certification of George G. Galey dated July 23, 2007 ("Galey Cert.") ¶ 1.) Kreglinger is an Australian wine producer that is headquartered in Belgium. (Certification of Wim Arnouts dated June 21, 2007 ("Arnouts Cert.") ¶ 2.)

In 1998, American Estates entered into a business relationship with Pipers Brook

Vineyard Ltd. ("Pipers Brook"), a Tasmanian vineyard and wine producer, under which American Estates imported wines produced by Pipers Brook and sold those wines in the United States. (Galey Cert. ¶¶ 4-5.) Specifically, the relationship began in September of 1998, when representatives from Pipers Brook met with American Estates representatives at a meeting in New York to negotiate a contract. (Id. at ¶ 4.)

On October 1, 1998, Pipers Brook mailed a signed memorandum of understanding to American Estates's New Jersey address.[1] (Id. at ¶ 5; Memorandum of Understanding dated October 1, 1998, attached as Ex. 2 to Galey Cert.) The memorandum states that Pipers Brook will ship 250 cases of 1998 Ninth Island Pinot, as well as pilot quantities of other Ninth Island and flagship wines, into American Estates' warehouses. (Id.) Limited quantities of these labels were to be delivered directly to a handful of Pipers Brook shareholders on the east coast of the United States. (Id.)

The memorandum also stated that Pipers Brook aimed to roll out its products in February, focusing initially on the New York market with slow but steady development of further outlying markets, including other states. (Id.) Pipers Brook's ultimate objective, as stated in the memorandum, was to sell 500 cases per year of Ninth Island Pinot and Chardonnay, and lesser volumes of its flagship labels. (Id.) On February 11, 1999, Pipers Brook appointed Lauber Imports, Ltd. ("Lauber"), American Estates's wholesaler in New Jersey, as its brand agent for the State of New Jersey. (Id. at ¶ 7, Letter from Dr. Andrew Pirie to Lauber Imports, Inc., attached

---

[1] The memorandum of understanding provided by Plaintiff is signed by Dr. Andrew Pirie, then Managing Director of Pipers Brook. Although the memorandum includes a signatory box to confirm American Estates' receipt of and agreement to its terms and details, the copy provided in Exhibit 2 to the Certification of George A. Galey is not signed. (Id. Ex. 2.)

as Ex. 6 to Galey Cert.)

In 2002, Kreglinger acquired a controlling interest in Pipers Brook, thereby becoming Pipers Brook's parent company. (Arnouts Cert. ¶ 3.) On December 29, 2004, Kreglinger sent a letter to American Estates informing American Estates of its acquisition of Pipers Brook. (Galey Cert. ¶ 2; Letter from Andrew Seitz, Chief Financial Officer of Kreglinger, to American Estates Wines Inc. dated December 29, 2004, attached as Ex. 1 to Galey Cert.) The letter stated that "[t]he new corporate identity simply reflects [Pipers Brook] belonging to the Global Kreglinger Group of companies[,]" and that "the name change will have no impact on the Company's operations or its contractual relationships with its customers." (Galey Cert. Ex. 1.)

Kreglinger communicated with American Estates through email, facsimiles, and telephone calls. (Galey Cert. ¶ 6.) Kreglinger also regularly sent representatives to marketing events and other meetings with American Estates representatives in the United States. (Id. at ¶ 11, Ex. 15-19, 21, 23.)

American Estates placed orders with Kreglinger, or its affiliates, for wines, to be purchased in Australia. (Arnouts Cert. ¶ 6.) The orders were filled in Australia by Kreglinger, and sold to American Estates F.O.B. Adelaide or Melbourne, Australia.[2] (Id. at ¶ 7.) From there, American Estates would send the wines back to the United States for distribution. (Id. at ¶ 8.)

---

[2] F.O.B., or "free on board," is a mercantile term that means that the seller must deliver the goods to a named vessel and that the seller bears the risk of loss up until the point of delivery. Black's Law Dictionary 665 (6th ed. 1990).

American Estates attempts to characterize its business relationship with Kreglinger as "of much greater legal significance than a mere FOB sales agreement." (Galey Cert. ¶ 8.) However, American Estates has not alleged any facts or submitted any evidence disputing that it purchased wines from Kreglinger F.O.B. Australia.

Kreglinger maintained no office in New Jersey, and did not have any employees located in the United States.  (Id. at ¶¶ 9-10.)

In October of 2006, Kreglinger terminated its business relationship with American Estates in the New York, New Jersey, and Pennsylvania markets.  (Pl. First Am. Compl. ¶ 11.)  In March of 2007, Kreglinger terminated its business relationship with American Estates with regard to the remaining markets in the United States.  (Id. at ¶ 12.)

On April 12, 2007, American Estates filed the instant Complaint against Kreglinger in the New Jersey Superior Court, Union County, alleging that Kreglinger breached the covenants of good faith and fair dealing implicit in its contract with American Estates.  Kreglinger removed the action to this Court, then filed the instant motion to dismiss the action for lack of personal jurisdiction.

## II. STANDARD OF REVIEW

A federal court sitting in diversity must conduct a two-step analysis to ascertain whether personal jurisdiction exists.  First, the court must look to the forum state's long-arm statute to determine if personal jurisdiction is permitted over the defendant.  Second, the court must determine whether the exercise of jurisdiction violates Due Process of the Fourteenth Amendment.  See IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 259 (3d Cir. 1998); Vetrotex Certaineed Corp. v. Consolidated Fiber Glass Products Co., 75 F.3d 147, 150 (3d Cir. 1996).  In this forum, the inquiry is collapsed into a single step, because New Jersey's long arm statute permits the exercise of personal jurisdiction to the fullest limits of due process as defined under the Constitution of the United States.  As such, federal law defines the parameters of this Court's in personam jurisdiction.  See IMO Indus., Inc., 155 F.3d at 259.

The Fourteenth Amendment permits a state to exercise jurisdiction over an out-of-state defendant only where "the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985) (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)). The plaintiff has the burden of proving that the defendant purposefully availed itself of the forum state. Burke v. Quartey, 969 F. Supp. 921, 924 (D.N.J. 1997).

Specific jurisdiction is invoked when a claim is related to or arises out of the defendant's contacts with the forum. See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 413-14 (1984). A court must first determine whether the defendant had the minimum contacts with the forum necessary for the defendant to have "reasonably anticipate[d] being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980) (citations omitted). What constitutes minimum contacts varies with the "quality and nature of defendant's activity." Hanson, 357 U.S. at 253. In assessing the sufficiency of minimum contacts for personal jurisdiction, the court must focus on the "relationship among the defendant, the forum, and the litigation." Keeton v. Hustler, 465 U.S. 770, 775 (1984). Otherwise stated, there must be at least "a single deliberate contact" with the forum state that relates to the cause of action. United States Golf Ass'n v. United States Amateur Golf Ass'n, 690 F. Supp. 317, 320 (D.N.J. 1988). The unilateral acts of the plaintiff, however, will not amount to minimum contacts. Helicopteros Nacionales de Colombia, 466 U.S. at 414; Hansen, 257 U.S. at 253. The burden to produce actual evidence of the defendant's contacts with the forum state rests on the plaintiff. See Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 66 n.9 (3d Cir. 1984).

Assuming minimum contacts have been established, a court must then consider whether

"the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" Burger King, 471 U.S. at 476 (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 320 (1945)); see also Pennzoil Prod. Co. v. Colelli & Assoc. Inc., 149 F.3d 197, 201 (3d Cir. 1998).  For personal jurisdiction to comport with "fair play and substantial justice," it must be reasonable to require the defendant to defend the suit in the forum state.  World-Wide Volkswagen, 444 U.S. at 292.  To determine reasonableness, a court considers the following factors: (1) the burden on the defendant; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the states in furthering substantive social policies.  Id.  Only in "rare cases [do the] minimum requirements inherent in the concept of fair play and substantial justice . . . defeat the reasonableness of jurisdiction even [though] the defendant has purposefully engaged in forum activities."  Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal., Solano County, 480 U.S. 102, 116 (1987) (Brennan, J., concurring) (quotations omitted); Pennzoil, 149 F.3d at 207.

If the plaintiff cannot establish specific jurisdiction, a court may exercise general jurisdiction over the defendant if the defendant has maintained "continuous and systematic" contacts with the forum state.  Helicopteros Nacionales de Colombia, 466 U.S. at 416.  To establish general jurisdiction, the plaintiff "must show significantly more than mere minimum contacts" with the forum state.  Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n, 819 F.2d 434, 437 (3d Cir. 1987).  Moreover, the facts required to establish general jurisdiction must be "extensive and persuasive."  Reliance Steel Prods. v. Watson, Ess, Marshall & Enggas, 675

F.2d 587, 589 (3d Cir. 1982).[3]

### III. ANALYSIS

**A.     Minimum Contacts**

American Estates argues that this Court has specific jurisdiction over Kreglinger in two respects: (1) Kreglinger established a business relationship with American Estates in New Jersey through its meetings and correspondence; and (2) Pipers Brook, Kreglinger's predecessor, negotiated the original business arrangement with American Estates in New Jersey, and placed its wine products into the stream of commerce in New Jersey through American Estates. This Court will address each argument in turn.

   1.     Contacts Through The Business Relationship And Correspondence

American Estates argues that Kreglinger fostered repeated and systematic contacts with New Jersey through its business relationship and correspondence with American Estates. (Pl. Br. 5-7.)  To support its argument, American Estates notes that Kreglinger contracted with American Estates, a corporation located in New Jersey, and communicated frequently with American Estates through telephone calls, facsimile transmissions, and email. (Galey Cert. ¶ 6.)

These alleged facts, however, do not suffice as minimum contacts giving rise to personal jurisdiction over Kreglinger. The Third Circuit has stated that "a non-resident's contracting with a forum resident, without more, is insufficient to establish the requisite 'minimum contacts.'" BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp., 229 F.3d 254, 261 (3d Cir. 2000) (quoting Sunbelt Corp. v. Noble, Denton & Assoc., Inc., 5 F.3d 28, 32 (3d Cir. 1993)).

---

[3] American Estates only argues that this Court has specific jurisdiction over Kreglinger. As such, this Court shall not discuss the issue of general jurisdiction.

"[I]nformational communications in furtherance of [such a] contract [also] do not establish the purposeful activity necessary for a valid assertion of personal jurisdiction." Sunbelt, 5 F.3d at 32. The fact that the business relationship between the two parties involved American Estates purchasing Kreglinger wines F.O.B. Australia further weakens Kreglinger's contacts with New Jersey. See Singletary v. B.R.X., Inc., 828 F.2d 1135, 1136 (5th Cir. 1987) (finding that the "contact was weakened even further by the fact that the sale was initiated by the buyer and was shipped F.O.B. California, the seller's place of business"). Thus, Kreglinger's business relationship and communications with American Estates alone do not rise to the level of purposeful availment.

American Estates also points out that Kreglinger sent its marketing managers to the United States for business meetings. (Galey Cert. ¶ 11.) However, based on the evidence submitted, the ultimate destinations of these visits were to places other than New Jersey.[4] (See Id. at Ex. 15 (no state mentioned), Ex. 16-17 (New York), Ex. 18 (Massachusetts, New York, Arkansas, Missouri), Ex. 19 (Massachusetts, New York), Ex. 21 (New York), Ex. 23 (Massachusetts).) Although it appears that the marketing managers may have flown into Newark-Liberty International Airport on some of these visits, this connection to New Jersey is too attenuated to rise to the level of purposeful availment. Cf. Burakiewicz v. Propulsion Indus., Inc., No. 89-0153, 1989 WL 59658, at *3 (D.N.J. June 1, 1989) (holding that business meeting held at Newark, New Jersey airport did not suffice to create minimum contacts with the state).

---

[4] American Estates's allegation that Steve Grimley visited New Jersey lacks evidentiary support. (Galey Cert. ¶ 11.)

  2.  <u>Contacts of Kreglinger's Predecessor through Stream-of-Commerce Theory</u>

American Estates contends that Kreglinger had systematic contacts with New Jersey due to its acquisition of Pipers Brook, since representatives from Pipers Brook traveled to New Jersey and negotiated the original agreement with American Estates, and sold its wines in New Jersey. (Galey Cert. ¶ 4.)  American Estates argues that, by acquiring Pipers Brook, Kreglinger acceded to its jurisdictional contacts.

This Court recognizes that "the jurisdictional contacts of a predecessor corporation may be imputed to its successor corporation without offending due process." <u>Wortham v. Karstadtquelle AG</u>, 153 F. App'x 819, 825 (3d Cir. 2005) (per curiam) (quoting <u>Purdue Research Found. v. Sanofi-Synthelabo, S.A.</u>, 338 F.3d 773, 783 (7th Cir. 2003)).  The Third Circuit describes this concept as "successor jurisdiction."  <u>Wortham</u>, 153 F. App'x at 822.  Successor jurisdiction "can be present in the following situations: (1) merger or de facto merger; (2) express or implied assumption of liabilities, including by a ratification of the predecessor's activities; or (3) acquisition of assets or reorganization undertaken to fraudulently avoid jurisdiction."  <u>Id.</u> at 823; cf. <u>Poulis v. Clark Equip. Co.</u>, 802 F.2d 75, 77-78 (3d Cir. 1986) (describing similar circumstances where successor liability would apply).

The facts alleged show that Pipers Brook executed a de facto merger with Kreglinger, and that Kreglinger expressly assumed Pipers Brook's liabilities to American Estates upon finalization of the merger.  A de facto merger is "[a] transaction that has the economic effect of a statutory merger but is cast in the form of an acquisition of assets or an acquisition of voting stock and is treated by a court as if it were a statutory merger."  <u>Black's Law Dictionary</u> 989 (6th ed. 1990); <u>see also</u> <u>In re N.Y. City Asbestos Litig.</u>, 15 A.D.2d 254, 256 (N.Y. App. Div. 2005).

Here, Kreglinger acquired an eighty-five percent controlling interest in Pipers Brook in 2002. (Certification of Charles van Havre dated August 20, 2007 ("van Havre Cert.") ¶ 5.) After the acquisition, Kreglinger chose to continue the business relationship that Pipers Brook had established with American Estates (Arnouts Cert. ¶ 5), and informed American Estates of such in 2004 (Galey Cert., Ex. 1). These actions render Kreglinger the jurisdictional successor of Pipers Brook. Thus, if the actions of Pipers Brook constitute minimum contacts within the state of New Jersey, this Court would have personal jurisdiction over Kreglinger.

At first blush, it appears that Pipers Brook's actions did not create minimum contacts with the state of New Jersey. Pipers Brook representatives negotiated the business agreement with American Estates in New York, not New Jersey. (Galey Cert. ¶ 4, Ex. 2.) The mere mailing of the memorandum of understanding to New Jersey does not make this contact sufficient to convey jurisdiction. See Sunbelt, 5 F.3d at 32. Subsequent visits by Pipers Brook's representatives likewise did not take place in New Jersey. (See Galey Cert., Ex. 14.) However, Pipers Brook's use of a New Jersey distributor to place its wines into New Jersey's stream of commerce subjected Pipers Brook to the jurisdiction of New Jersey courts.

The stream-of-commerce theory allows a forum state "to exercise personal jurisdiction over a non-resident defendant that delivered its goods, albeit indirectly, into the state and either derived a substantial benefit or had a reasonable expectation of deriving such a benefit." A.V. Imports, Inc. v. Col De Fratta, S.p.A., 171 F. Supp. 2d 369, 372 (D.N.J 2001) (quoting Pennzoil, 149 F.3d at 203). New Jersey has adopted this theory as a basis for finding personal jurisdiction over "a foreign manufacturer that has caused property damage or economic loss." Charles Gendler & Co. v. Telecom Equip. Corp., 508 A.2d 1127, 1139 (N.J. 1986).

10

In discussing the scope of the stream-of-commerce theory, the Supreme Court of the United States has discussed two standards.[5] See generally Asahi, 480 U.S. 102. Writing for a plurality of four, Justice O'Connor concluded that the mere placement of a product into the stream-of-commerce is not enough to suffice as minimum contacts. Id. at 112. Justice O'Connor stated that purposeful availment required "[a]dditional conduct of the defendant [that] may indicate an intent or purpose to serve the market in the forum State." Id. Justice O'Connor then provided examples of such conduct: "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." Id.

Justice Brennan, writing for a different plurality of four, disagreed with the notion that additional conduct was necessary. After defining stream of commerce as "the regular and anticipated flow of products from manufacture to distribution to retail sale," Justice Brennan explained that "[a]s long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise." Id. at 117 (Brennan, J., concurring). According to Justice Brennan, if a defendant "place[s] goods in the stream of commerce [and] benefits economically from the retail sale of the final product in

---

[5] Justice Stevens, the ninth vote in Asahi, presented a different approach. Justice Stevens was unconvinced that "an unwavering line can be drawn between mere awareness that a component will find its way into the forum State and purposeful availment of the forum's market." Id. at 122 (Stevens, J., concurring) (internal quotations omitted). Instead, Justice Stevens proposed that a determination of purposeful availment must consider "the volume, the value, and the hazardous character of the components [placed in the stream of commerce]." Id. (Stevens, J., concurring). In Pennzoil, the Third Circuit did not find Justice Stevens's position essential to the stream-of-commerce analysis. 149 F.3d at 207 n.12.

the forum State," the defendant is subject to that state's jurisdiction "regardless of whether that participant directly conducts business in the forum State, or engages in additional conduct directed toward the State." Id. (Brennan, J., concurring).

The Third Circuit has not definitively adopted either Justice's standard; instead, it counsels lower courts to apply both Justice O'Connor's standard and Justice Brennan's standard to the facts of each case. Pennzoil, 149 F.3d at 207 n.11.[6] As such, this Court will apply both standards to the case here.

In order to satisfy both standards, Pipers Brook must first have placed its product into the stream of commerce. See Asahi, 480 U.S. at 112 & 117 (Brennan, J., concurring). This was clearly accomplished when Pipers Brook entered into a business agreement with American Estates, under which American Estates distributed Pipers Brook's (and, subsequently, Kreglinger's) wines in New Jersey and other parts of the United States, through the use of brand agents. (See Galey Cert., Ex. 2-6.) "[T]he absence of direct sales or shipments into the forum is not dispositive." Renner v. Lanard Toys Ltd., 33 F.3d 277, 282 (3d Cir. 1994). Under the stream-of-commerce theory, "a manufacturer may be held amenable to process in a forum in which its products are sold, even if the products were sold indirectly through importers or distributors with independent sales and marketing schemes." Dejames v. Magnificence Carriers,

---

[6] In Pennzoil, the Third Circuit specifically stated,
> One may note that, since Justice O'Connor's standard is more demanding than Justice Brennan's, any factual scenario that satisfies the former will probably satisfy the latter as well. Still, since we have not manifested a preference for either of the two standards, the demands of clarity counsel us to apply both standards explicitly. The clear satisfaction of both the O'Connor and the Brennan standards obviates any need to adopt one over the other.

149 F.3d at 207 n.11.

12

Inc., 654 F.2d 280, 285 (3d. Cir. 1981), cert. denied, 454 U.S. 1085 (1981); see A.V. Imports, 171 F. Supp. at 374.  Even if Pipers Brook sold its wines F.O.B. to American Estates, "[n]othing in Justice O'Connor's plurality opinion suggests that the fact that a foreign manufacturer or seller rids itself of title by a sale F.O.B. a foreign port is enough to insulate that manufacturer or seller from jurisdiction."  Renner, 33 F.3d at 282.

Pipers Brook, and subsequently Kreglinger, placed their wines "in the stream of commerce [and] benefit[ed] economically from the . . . sale of the final product in" New Jersey.  Asahi, 480 U.S. at 117 (Brennan, J., concurring).  As such, Kreglinger benefitted from New Jersey's "laws that regulate and facilitate commercial activity."  Id. (Brennan, J., concurring).  Therefore, under Justice Brennan's standard, Kreglinger has the minimum contacts necessary for New Jersey to exercise jurisdiction.

To satisfy Justice O'Connor's standard, this Court must find "[a]dditional conduct" by Pipers Brook that indicates "an intent or purpose to serve the market" in New Jersey.  Asahi, 480 U.S. at 112.  Justice O'Connor stated, as an example of such additional conduct, "marketing the product through a distributor who has agreed to serve as the sales agent in the forum State."  Id.  Pipers Brook's conduct conforms to this example of additional conduct.  Pipers Brook secured Lauber as its brand agent for New Jersey.  (Galey Cert. ¶ 7, Ex. 6.)  Moreover, after acquiring Pipers Brook, Kreglinger maintained Lauber as its brand agent for New Jersey.  (See emails between Simon Buck and Charles van Havre dated March 2-3, 2006, attached as Ex. 16 to Galey Cert.; Grand Annual Tasting 2006 participation form, attached as Ex. 17 to Galey Cert.)

Under Justice O'Connor's standard, the appointment of Lauber as Pipers Brook's brand agent suffices to render Pipers Brook subject to New Jersey's jurisdiction.  As Pipers Brook's

jurisdictional successor, Kreglinger likewise has contacts with New Jersey sufficient to subject it to suit in this state.

In sum, Kreglinger purposely availed itself of the laws of New Jersey by acquiring Pipers Brook's assets and liabilities.  By agreeing to have American Estates distribute Pipers Brook's wines in the New Jersey market, Pipers Brook derived financial benefits from the sale of Kreglinger wines to New Jersey customers.  In addition, by using Lauber as its brand agent for the state of New Jersey, Pipers Brook took an additional step to serve the New Jersey market.  Such conduct satisfies Justice O'Connor's standard and Justice Brennan's standard.  Kreglinger's acquisition of Pipers Brook, and its decision to continue Pipers Brook's contractual relationships with its clients, allows Kreglinger to benefit from sales in New Jersey in the same manner as Pipers Brook.  Therefore, this Court concludes that Kreglinger has the requisite minimum contacts with New Jersey such that it should have expected to be sued in this state.

**B.**     **Fair Play and Substantial Justice**

Having found that Kreglinger has the minimum contacts necessary to be haled into court in New Jersey, this Court must determine if exercising jurisdiction over Kreglinger would comport with notions of "fair play and substantial justice."  At this step, "the defendant must present 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'"  A.V. Imports, 171 F. Supp. at 375 (quoting Burger King, 471 U.S. at 477).  As discussed supra in Section II of this Opinion, the Court considers five factors: (1) the burden on the defendant; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of

the states in furthering substantive social policies.  World-Wide Volkswagen, 444 U.S. at 292.  However, courts rarely decline to find personal jurisdiction under the "fair play and substantial justice" prong, once minimum contacts have been established.  Asahi, 480 U.S. at 116 (Brennan, J., concurring); see also Pennzoil, 149 F.3d at 207.

In arguing that exercising jurisdiction would be unreasonable, Kreglinger focuses squarely on the fact that it conducts sales solely in Australia, a foreign country.  (Def. Br. at 9.)  Kreglinger believes that it could not reasonably anticipate being haled into court in New Jersey based on actions that occurred "exclusively in its home country."  (Id.)  This, however, was proven incorrect by a showing that minimum contacts existed between Kreglinger and New Jersey.  See World-Wide Volkswagen, 444 U.S. at 297 ("When a corporation purposely avails itself of the privilege of conducting activities within the forum State, it has clear notice that it is subject to suit there.") (internal quotations and citations omitted).  By acquiring a company that provides a medium for distributing goods in New Jersey, Kreglinger cannot say that it did not anticipate being sued in New Jersey.

In addition, "New Jersey has a strong interest in providing a forum for its residents and in enforcing the contractual obligations of parties who contract with New Jersey residents."  Apollo Techs. Corp. v. Centrosphere Indus. Corp., 805 F. Supp. 1157, 1186-1187 (D.N.J. 1992) (citing Koff v. Brighton Pharm., Inc., 709 F. Supp. 520, 528 (D.N.J. 1988)).  New Jersey plaintiffs also have a valid interest in litigating claims in their home state.  Apollo Techs., 805 F. Supp. at 1187; Koff, 709 F. Supp. at 528; Charles Gendler, 102 N.J. at 484.

The burden that Kreglinger claims to have is not enough to counter these interests.  Thus, this Court holds that exercising jurisdiction over Kreglinger is consistent with notions of fair play

and substantial justice.

## IV. CONCLUSION

For the aforementioned reasons, this Court finds that Kreglinger has the requisite minimum contacts with New Jersey, and that this Court's exercise of jurisdiction over Kreglinger does not offend fair play and substantial justice. Kreglinger's motion to dismiss for lack of personal jurisdiction, pursuant to FED. R. CIV. P. 12(b)(2), shall be denied.

Date: March 25, 2008

                                               S/Joseph A. Greenaway, Jr.
                                               JOSEPH A. GREENAWAY, JR., U.S.D.J.